UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SCOTT,<br><br>    Petitioner,<br><br>    v.<br><br>MIKE MCDONALD,<br><br>    Respondent. | No. 2:13-cv-0022 KJM CKD P<br><br><br>FINDINGS & RECOMMENDATIONS |

Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas corpus under 28 U.S.C. § 2254. He is serving sentences of life imprisonment and 25-years-to-life after being convicted in Sacramento County of first degree murder. He challenges his conviction.

I. Background

On direct appeal, the California Court of Appeal summarized the facts presented at trial and relevant trial court proceedings as follows:

> FACTS
>
> I
>
> *The Shooting*
>
> On August 8, 2006, Karl Moore was spending time with his cousin, defendant Scott. [Footnote omitted.] They met at Moore's Aunt Brenda's house in Meadowview. Shortly before 7:00 p.m., they went to Walgreen's drug store with another family member. After they returned, [co-defendant] Clark-Johnson arrived. The three sat

1

in Clark-Johnson's car, a gold Chevrolet Lumina, and smoked marijuana. They then drove through Meadowview. Moore was in the backseat, while Scott was the front passenger and Clark-Johnson drove.

They encountered a green car, a "scraper," and chased it.[1] The green car was driven by Thomas Rumph.[2] Both cars were going very fast, about 50 miles per hour. The Lumina made U-turns, sharp turns, and did not stop at stop signs. The chase lasted three to five minutes.

Anthony Johnson was walking down Collingwood and saw the chase; indeed, at one point the green car almost hit him. As the Lumina passed, it slowed down. Scott, in the front passenger seat, was positioned partially outside of the car, "hanging out the window," holding a handgun. Scott threw Johnson a "B" sign, representing the Blood street gang. Johnson had been a Meadowview Blood in high school and interpreted Scott's gesture as a sign of respect or greeting. The Lumina sped back up.

Marquail Sarente and Shaaneel Singh were on their bikes on a nearby corner, having gone to the store for Sarente's mother to obtain a "swisher," a cigar that can be used to smoke marijuana. Sarente saw two cars racing on Tamoshanter. The Lumina stopped at the stop sign on Tamoshanter, at the same intersection as Sarente and Singh. From his position "hanging outside of the car," Scott held his arm straight out and fired the handgun. Sarente was passing the marijuana cigar to Singh when he heard the shots. Singh was shot in the head and fell to the ground. Multiple shots, about five or six, were fired. The Lumina sped off. After the shooting, Sarente ran around yelling. He ran to a house where he told one of Scott's friends, "Your home just shot and killed my homie."

Moore was in the backseat crying with his eyes closed during the shooting. On the drive to Aunt Brenda's, the occupants of the Lumina did not discuss the shooting. Scott and Clark-Johnson asked Moore why he was scared. They said Moore was being "the scary bitch punk."

Singh died from a gunshot wound to the head.

/////

/////

/////

---

[1] A "scraper" is an older American car, such as a Buick or Oldsmobile, with rims.

[2] Rumph was booked into the main jail shortly after the shooting. In a phone call from jail on August 16, 2006, Scott told Clark-Johnson that he had settled his disagreement or "squashed a beef" with Rumph, although Clark-Johnson denied at trial that he knew Scott was talking about Rumph.

2

II

*The Investigation*

The police responded at 7:30 p.m. to calls about the drive-by shooting. The supervisor of the gang suppression unit contacted Anthony Johnson who identified Scott as the person in the car who brandished the firearm and flashed the gang sign. [Footnote omitted.] The police also interviewed Sarente. Sarente was concerned about his safety, but he swore on his dead grandmother that the shooter looked like "Mike" (indicating Scott). He and Scott used to be friends, but then started having problems. Sarente identified Scott to law enforcement as the person responsible for the shooting. At trial, Sarente testified he and Scott had a misunderstanding over a female, "a little something but nothing for this to happen."

At the main jail, calls by inmates are recorded. Scott, who was arrested shortly after the shooting, made several calls using another inmate's X-ref number. In several calls, including one to Clark-Johnson, Scott indicated that the police were looking for two other people and a "Scooby-Doo," a reference to the Lumina. Scott also said that Clark-Johnson needed to "be cool" and stay out of the way. Scott "reminded" Clark-Johnson that the only time Scott left the house that night "was to go to Walgreen's remember?"

The lead detective contacted Clark-Johnson, who cooperated and went to the police station to give a statement. Clark-Johnson said he was at a baseball game at Sacramento State University the night of the shooting from 6:00 p.m. to 9:45 p.m. Clark-Johnson consented to a search of his bedroom. The police found photographs they deemed gang related.

Cell phone records indicated that Clark-Johnson's cell phone was not in the vicinity of the Sacramento State University the night of the murder until 9:30 p.m. Someone using Clark-Johnson's phone had called Scott's phone twice around 7:00 p.m. and again about 10:00 p.m.

The police also interviewed Moore. Moore originally denied having any knowledge about the shooting, but gradually provided some information. Moore told the police he did not see Scott's gun, but knew he had one "because they talked." The gun was in Scott's backpack. Scott did not specifically show it to Clark-Johnson but Moore said, "They're pretty much with each other a lot so I mean -- ."

Forensics determined the bullets were "nominal .38 caliber," most likely a nine-millimeter Luger. No gunshot residue was found on Sarente; there was a gunshot residue particle on Singh's left hand. Characteristic gunshot residue was collected from the interior of the Lumina. The residue was consistent with a gun having been fired from within the car.

/////

A few months before the trial, a deputy searched Scott's cell at the jail. In Scott's property box, he found four letters from Clark-Johnson, letters from other inmates, photographs, and magazine clippings. A coded writing system was found inside Scott's Bible. Portions of the letter were decoded and translated into "M gang or don't bang" and "Fuck all craz." [Footnote omitted.] Nothing was found in a search of Clark-Johnson's cell.

### III

### *Gang Evidence*

Both defendants were charged with a gang enhancement pursuant to [California Penal Code] section 186.22, subdivision (b)(1). The People took the position that "the motive and rationale for this violent act was classic gang style behavior." Over defense objection, Detective Scott MacLafferty testified as an expert on African American street gangs.

MacLafferty testified the most common street gangs in South Sacramento were the Bloods, the Crips, and Bay Area groups. One subset of the Bloods gang was the Meadowview Bloods. In a gang, respect was the number one thing needed to survive. A gang member earned respect by "work," the crimes and violence that caused fear and intimidation in rival gangs and the community.

MacLafferty considered the Meadowview Bloods a criminal Street gang; its primary activities were drug dealing, assault with a deadly weapon, robbery, intimidation of witnesses, burglary, and various firearm offenses. MacLafferty testified about two prior crimes by validated members of the Meadowview Bloods, Christopher Williams and Solomon Temple. These crimes benefitted the Meadowview Bloods by causing fear and intimidation.

As of August 2006, Scott had not been validated as a Meadowview Blood member. MacLafferty opined that Scott was then a Meadowview Blood, based on Scott's gang contacts. The expert based his opinion in part on the photographs and letters found in Scott's cell. Several photographs showed Scott and Clark-Johnson throwing Blood gang hand signs. Citing these pictures, MacLafferty opined that Clark-Johnson was a Meadowview Blood associate, not a member.

MacLafferty read to the jury substantial portions of letters found in Scott's cell and pointed out references to the Meadowview Bloods. The letters questioned Scott's loyalties and stated more was expected of a gang leader. MacLafferty could not explain certain street lingo in the letters, on cross-examination, MacLefferty conceded the letters were received two and a half years after the shooting and they admonished Scott for failing to live up to the expectations of the Blood gang. MacLafferty was of the opinion the letters showed Scott had attained the status of shot-caller within the gang.

/////

4

MacLafferty also read rap lyrics found in Scott's cell. MacLafferty first testified he did not know who wrote the lyrics, but later gave the opinion Scott authored them because the author referred to himself as "Mad Mike."[3] To MacLafferty, one lyric indicated the person who wrote it never snitched and another referred to someone who lies dead on the ground. Other lyrics discussed gang activity, weapons, and other gang members or "goons." MacLafferty believed these lyrics closely resembled the facts of this case.

MacLafferty also testified about a "code" found in Scott's cell; the code was to be used by Meadowview Bloods. A writing in the code had been translated: "M Gang or don't bang," which MacLafferty interpreted to mean "you bang Meadowview or your [sic] don't bang."

MacLafferty gave the opinion that the murder was gang related based on the totality of the photographs, letters and conduct, that it occurred in Meadowview, and that Scott threw gang signs before the shooting. The crime benefitted the Meadowview Bloods because rivals would know about it.

IV

*The Defense*

Clark-Johnson testified in his own defense. He was good friends with Scott and had known him since fifth or sixth grade. His plan for August 8, 2006, was to pick up Manuel B. and go to a baseball game at Sacramento State University, where a little league tournament was being held.

Clark-Johnson drove to Aunt Brenda's where Scott and Moore were. They planned to "chill" by smoking marijuana and listening to music for an hour before the ball game. They sat in the car for 15 minutes smoking marijuana. When they left they saw a green car. Clark-Johnson was driving. Scott told him to "scrape up on it," which meant to go faster. Clark-Johnson denied he saw Anthony Johnson, or that he saw Scott with a gun, lean out the window, or throw a gang sign. When he stopped at a stop sign, he heard a shot. He looked over and Scott was leaning out the window with a gun in his hand, arm pointing straight out.

They drove back to Aunt Brenda's. Moore asked who it was and Scott said, "Tree, he's trying to get me."[4] They stayed at Aunt Brenda's for an hour and a half but did not talk about the shooting directly; however, the need to "be cool," "relax," and not to "worry" was discussed.

Clark-Johnson went to the baseball field and met up with Manual B. After a half hour or hour, he dropped his friend off and went home. Scott called that night and said he watched the 10:00 p.m.

---

[3] Moore told Detective Lange that he called Scott "Mad Mike."
[4] Sarante was also known as Tree.

5

news. Clark-Johnson watched the news at 11:00 p.m. and learned that someone had been shot and killed. Clark-Johnson saw Scott two days later. Scott said he originally did not think anyone had been shot. Scott explained that he had had a minor run-in with Sarente. Sarente told Scott that when he next saw Scott, he was going to smack him.

Clark-Johnson admitted he had lied to the police and to his father. He did not want to be involved; he just wanted "the situation" to "go away."

In his defense, Scott offered the testimony of a woman who was walking on Tamoshanter when shots were fired. She saw a young man with hair in "dreads" run from house to house, banging on doors. Scott's defense was that he shot because Sarente had threatened to shoot him. He suggested that Sarente may have disposed of his gun before the police arrived. The court instructed the jury on voluntary manslaughter based on imperfect self-defense.

Petitioner presented both of the claims he presents in this action to the California Court of Appeal and the California Supreme Court on direct review. The California Court of Appeal was the last court to issue a reasoned decision with respect to the claims.

II. Standard For Habeas Corpus Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)." It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

/////

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams [v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

When a state court rejects a federal claim without addressing the claim, a federal court presumes the claim was adjudicated on the merits, in which case § 2254(d) deference is applicable. Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013). This presumption can be rebutted. Id.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. "Clearly established" federal law is that determined by the Supreme Court. Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004). At the same time, it is appropriate to look to lower federal court decisions as persuasive authority in determining what law has been "clearly established" and the reasonableness of a particular application of that law. Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court precedent is misplaced).

III. Petitioner's Claims And Analysis

    A. Failure To Bifurcate Gang Enhancement

Petitioner describes his first claim as follows:

> Petitioner did not receive a fair trial because the court refused to bifurcate the gang enhancement from trial on the murder charge, permitting admission of evidence which was prejudicial to the only contested issue, the existence of the mental state element for premeditated first degree murder.

"The simultaneous trial of more than one offense must actually render [a habeas] petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate." Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991). The Ninth Circuit's conclusion is a logical extension the of the Supreme Court's decision in U.S. v. Lane, 474 U.S. 438, 446 n. 8 (1986), where the Supreme Court found that improper joinder of criminal defendants at trial does not violate the Constitution unless the improper joinder results in prejudice so great that the due process right to a fair trial is breached.

The California Court of Appeal found that petitioner failed to show he was prejudiced by the trial court's failure to bifurcate the gang enhancement from the first degree murder charge:

> Both defendants [petitioner and Clark-Johnson] contend the trial court erred in refusing to bifurcate the gang enhancements. Although the jury found the gang enhancements not true, defendants contend they were prejudicial due to the inflammatory and prejudicial nature of the gang evidence. . . Scott argues the prosecution used the gang evidence to demonstrate his criminal disposition, focusing on the violent gang lifestyle to show that Scott had the requisite intent to kill because he was a gang member and gang members kill.
>
> Scott asserts the key issue at trial was his state of mind, whether he had the intent to kill. He contends the People used the gang evidence to show his criminal disposition--that he was violent and therefore had the intent to kill. During closing argument, the prosecutor focused on the "gang lifestyle." "Consider the gang life lifestyle. . . . You can glean a lot from that." "Gang lifestyle, folks, it's violent but it's also pathetically predictable." "This is the gang lifestyle that is predicated on violence. The more violent, the better. Because the more violent you are, the more respect you are going to earn for yourself and for your gang." Scott however failed to object to this closing argument.
>
> Scott also complains that in explaining the basis for his opinion that Scott was a Meadowview Blood gang member, MacLafferty was permitted to testify at length about Scott's prior police contacts.

8

> Scott had denied being a gang member to a probation officer. He was with another Blood gang member when they were shot at, and during the investigation the police called Scott's cell phone and heard the message, "Meadowview niggas taking care of business. Bring it." Scott was shot in the head during a "sideshow," an event where people jump into the street or a parking lot and dance. Scott was with a gang member when the car he was riding in was stopped and a stolen gun was found. At another vehicle stop, a red rag was tied around the steering wheel and narcotic packaging was found in the vehicle.
>
> During MacLafferty's testimony, the trial court repeatedly admonished the jury that this hearsay evidence was admitted only to show the basis of the expert's opinion, not for the truth of the matter. The court told the jury that the expert was not vouching that this evidence was true. We presume the jury followed the instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139, ["we and others have described the presumption that jurors understand and follow instructions as '[t]he crucial assumption underlying our constitutional system of trial by jury.' [Citations.]"].)
>
> Moreover, the evidence was undisputed that Scott fired multiple shots at Singh and Sarente at relatively close range. This evidence alone shows Scott's intent to kill. (*People v. Smith*, (2005) 37 Cal.4th 733, 743; *People v. Lee* (1987) 43 Cal.3d 666, 679; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1244; *People v. Villegas,* (2001) 92 Cal.App.4th 1217, 1224-1225.)
>
> Neither defendant has carried his burden to show the failure to bifurcate trial on the gang enhancement caused prejudicial error.

After reviewing the California Court of Appeal's decision with respect to petitioner's first claim, the relevant portions of the record and relevant Supreme Court precedent, it is clear the decision to deny the claim is not contrary to, nor does it involve an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Also, the decision is not based upon an unreasonable determination of the facts. As indicated by the Court of Appeal, it was not disputed at trial that petitioner shot at Sarente and Singh from close range. Under California law, this is enough to establish the requisite intent for first degree murder. Furthermore, there was no significant evidence presented suggesting petitioner fired his gun in self-defense. Considering these facts, failure to bifurcate gang enhancements from petitioner's trial for first degree murder did not render the trial on first degree murder fundamentally unfair.

For these reasons petitioner's first claim should be rejected.

9

B. <u>Material Found In Petitioner's Cell</u>

Petitioner describes his second claim as follows:

> Petitioner was denied a fair trial in violation of the Fifth and Fourteenth Amendments because the prosecution expert was permitted to relate the contents of numerous writings and letters which were taken from the petitioner's cell over two years after the charged offense. The court of appeal agreed that it was error to permit unedited use of these writings as the basis of the expert's opinion but incorrectly applied the state law standard to find the admission harmless. . .

In a lengthy and thorough discussion of petitioner's second claim, the California Court of Appeal found as follows:

> Scott contends the admissions, over his objection, of numerous writings taken from his cell to support the expert opinion that he was a gang member was highly prejudicial and requires reversal. He contends that allowing the expert to read a substantial amount of hearsay that painted him as a violent gangster, and that had little or no relevance to the case, tainted the fairness of the trial and denied him due process.
>
> There were different categories of writings seized from Scott's cell and all were admitted over objection by the defense. Letters to Scott from Clark-Johnson were admitted during Clark-Johnson's testimony and they are not at issue here. The categories of writings at issue are letters to Scott from others, a "gang code," and decoded phrase, and rap lyrics.
>
> Scott repeatedly objected to the admission of the writings seized from his jail cell. Due to the variety of writings at issue and the trial court's failure to rule systemically as to each item or category, the rulings lack specificity or clarity. Indeed, it appears that even the trial court became confused as to which category of challenged evidence it had ruled on.
>
> Before trial, Scott objected to admission of the writings taken from his cell on the basis of a confrontation violation, and later he objected on grounds of relevance and Evidence Code section 352. The court indicated it would review the writings and asked the People to identify those it wished to introduce. Later, the court again indicated it would review the letters. Subsequently, the court ruled the writings to Scott from Clark-Johnson were admissible if a proper foundation were laid. The court ruled the People could mention these letters in opening statement.
>
> Just before opening statement, Scott objected to a rap lyric the People intended to read. The prosecutor explained she had it on a slide, but was not going to read it. Based on the prosecutor's representation that an adequate foundation could be laid at trial, the court permitted her to mention the rap lyrics in her opening

statement. She did, stating that law enforcement found letters and rap lyrics referencing Meadowview Bloods in Scott's jail cell.

During trial, when Scott renewed his objection to the writings, the court agreed with the People's position that their admissibility had already been established. In response to the defense objection that the presence of the purported "gang code" was irrelevant because it was discovered two years after the crime, the court instructed the People to present other gang evidence first before this evidence could be admitted. A review of the case file indicated that the court had reserved its rulings on the writings taken from Scott's cell that were not attributed to Clark-Johnson. The court found the issue was whether the writings should be excluded under Evidence Code section 352. It ruled that if there were evidence of a continuum of gang involvement from the time of the crime until the writings were found, the court would admit the additional writings. Scott objected again to admission of the writings on the grounds of Evidence Code section 352, the Fifth Amendment and due process. He objected to anything that was not written by him and because the writings were made over two years after the shooting. He argued the writings cover many topics and could confuse the jury.

Before MacLafferty testified about the writings, Scott raised another objection which was overruled. In giving his opinion as a gang expert, MacLafferty read lengthy portions of letters from unknown senders and rap lyrics found in Scott's cell. During MacLafferty's testimony, the court admonished the jury that the detective was relying on the writings to form his opinion, but he did not vouch for their truth. In addition, the court instructed the jury with CALCRIM No. 360 on the use of this evidence. [Footnote omitted.] Despite this limitation on use, in closing argument, the People relied on some of the rap lyrics to argue the murder was deliberate and premeditated. The writings were also admitted into evidence as exhibits.

"On direct examination, an expert may give the reasons for an opinion, including the materials the expert considered in forming the opinion, but an expert may not under the guise of stating reasons for an opinion bring before the jury incompetent hearsay evidence. [Citation.] A trial court has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay. [Citation.]" (*People .v Price* (1991) 1 Cal.4th 324, 416.)

In stating his opinions that the crime was gang related and Scott was a gang member, MacLafferty was permitted not only to refer to the letters and rap lyrics found in Scott's jail cell, but to read extensively from them. The author or authors of the letters was unknown. While MacLafferty opined Scott wrote the lyrics due to the reference to Mad Mike, his authorship was not established.

We recognize that a trial court is no longer required to expressly weigh prejudice against probative value on the record in deciding whether to admit evidence over an Evidence Code section 352 objection. (*People v. Williams*, (1997) 16 Cal.4th 153, 214.) "All

11

that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352. [Citation.]" The record shows that defense counsel cited Evidence Code section 352 and the "talismanic word 'prejudice'" (*People v. Padilla* (1995) 11 Cal.4th 891, 823, fn. 1), and the court expressly stated the issue of admission was governed by Evidence Code section 352. Thus, the record shows "the trial court had in mind the appropriate analytic framework for passing on the admissibility of the evidence, that the court was therefore aware of the need to weigh the evidence under section 352, and thus that it must have done so." (*People v. Padilla, supra*, 11 Cal.4th at p. 924.)

Although we understand the rule requiring an express weighing on the record has been relaxed, we note that, in this case, an express weighing by the trial court would have greatly aided our review in determining whether the court erred in admitting the writings. In particular an express weighing might have shed light on why the trial court believed it was appropriate to admit the writings in their entirety, without redaction.

We review the trial court's ruling on the admission of evidence for an abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547.) The writings, both the letters from unknown senders and the rap lyrics, had *some* probative value. As MacLafferty explained, each contained references to the Meadowview Bloods and gang activity that was probative to the gang enhancement. This probative value, however, was reduced because MacLafferty had already provided ample evidence, in the form of Scott's prior contacts and photographs showing him and Clark-Johnson throwing gang signs, that Scott was a Meadowview Blood. More significantly, the writing, particularly the rap lyrics, contained more than mere references to gangs.[5] MacLafferty was unable to explain most of the writings beyond the gang references and therefore could not have relied on them in forming his opinions. The prejudicial effect of these came not only from the depictions of violent gang life and guns, but also from language that most would consider racist and sexist. [Footnote omitted.] For the limited purpose for which these writings were admitted, the probative value of those portions of the rap lyrics that did not refer to gang affiliation was substantially outweighed by the prejudicial effect. (Evid. Code, § 352.)

Thus the trial court erred in admitting the writings in full. The court should have permitted MacLafferty to testify only that his

---

[5] Some of the rap lyrics could be read to refer to this crime and Scott's ease in killing someone. For example: "The 'hood is slum-ridden, and I was driven to do the wrong thang. /Bust a nigga shit and rearrange his whole mind frame." "When you see a dog like me come out the gate, /Don't bark, just bite an' won't hesitate. /Used 2 be on some calm shit, like 'let's just wait man.' /Now I'm hot as a nigga who traded places with Satan. /Pass me that .9—I got not time for debating." These lyrics were *not admitted to prove* intent (although the People referred to various lyrics to argue intent); the court repeatedly admonished the jury these writings were offered only to support MacLafferty's expert opinion.

12

>opinion was based in part on writings found in Scott's cell that contained gang references, or, at minimum, should have ordered the writings redacted to narrow the focus to the portions what were probative of gang affiliations, thereby limiting there prejudicial effect.
>
>Although we have found the trial court erred in admitting the entirety of the writings, we find the error was harmless. We reject Scott's assertion that the proper test is the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24, [17 L.Ed.2d 705, 710-711]; namely, whether the error was harmless beyond a reasonable doubt. "[G]enerally, violations of state evidentiary rules do not rise to the level of federal constitutional error. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 91.) Since there was a permissible inference to be drawn from this evidence, its erroneous admission did not violate due process. (*Jamal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 919-920; see *People v. Albarran*, *supra*, 149 Cal.App.4th at pp. 229-230.)
>
>Scott contends the jury may have used the gang evidence that reflected on his character to find he had the intent to kill. Scott's intent to kill, however, was amply shown by the manner of the killing regardless of gang status. Scott ordered Clark-Johnson to chase his opponent Rumph at high speeds, while Scott waved a gun out the window. When he saw Sarente, with whom he had quarreled, he fired several shots at fairly close range at two defenseless bicyclists. Scott continued to fire even after Singh fell, refuting any suggestion that he fired only a warning to scare them. The court repeatedly instructed the jury on the limited use of this evidence and we presume the jury follows the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) Finally, the jury's not true finding on the gang enhancement indicates the jury was not overwhelmed by the gang evidence, as Scott claims, but was able to analyze the facts as to each charge. Based on our review of the entire record, we conclude that it is not reasonably probable that Scott would have received a more favorable result absent the error in admitting the writings in full. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

As suggested by the Court of Appeal, violations of state law concerning the admission of evidence are not a basis for relief in federal court unless a violation of the Due Process Clause occurred in that the admission of the evidence rendered the trial fundamentally unfair. See <u>Perry v. Hew Hampshire</u>, 132 S. Ct. 716, 723 (2012).

After reviewing the Court of Appeal's extensive opinion concerning petitioner's second claim, relevant portions of the record and relevant Supreme Court precedent, the court finds that the Court of Appeal's conclusion that admission of the evidence in question did not rise to the level of a violation of the Due Process Clause of the Fourteenth Amendment is not contrary to,

13

nor does it involve an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Also, the conclusion is not based upon an unreasonable determination of the facts. Accordingly, petitioner is barred from obtaining federal habeas relief by 28 U.S.C. § 2254(d) as to his second claim.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for writ of habeas corpus be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: May 21, 2014

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
scot0022.157

14